IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AVDO HUKIC,                           )
                                      )
                    Plaintiff,        )
        v.                            )       Case No. 05 C 4950
                                      )
AURORA LOAN SERVICES, INC. and        )       Judge Virginia M. Kendall
OCWEN FEDERAL BANK, FSB,              )
                                      )
                    Defendants.       )
                                      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Avdo Hukic ("Hukic") filed a fifteen-count Amended Complaint against Aurora

Loan Services, Inc. ("Aurora") and Ocwen Federal Bank, FSB ("Ocwen" and together with Aurora,

"Defendants"). Seven counts were dismissed pursuant to Defendants' Motions to Dismiss. The

remaining counts against Defendants seek damages for breach of contract, tortious interference with

prospective economic advantage,[1] and violations of the Fair Credit Reporting Act ("FCRA") Section

15 U.S.C. § 1681s-2(b)[2]. Defendants have moved for summary judgment on all of the remaining

counts of Hukic's Amended Complaint. For the reasons stated below, Defendants' Motions for

Summary Judgment are granted and Hukic's claims against Aurora and Ocwen are dismissed with

prejudice.

---

[1] Hukic claims that Defendants tortiously interfered with his credit expectancy. Since there is no claim in Illinois for "tortious interference with credit expectancy," the Court examines this claim as one of tortious interference with prospective economic advantage.

[2] Hukic's claims brought under 15 U.S.C. §1681s-2(a) were dismissed.

## STATEMENT OF FACTS

### *Hukic's Mortgage Loan with Life Savings Bank*

Hukic entered into a mortgage loan ("the loan") with Life Savings Bank ("LSB") in September 1997. Pltf. 56.1 Resp. Aurora ¶ 1.[3] The note and mortgage concerned property located at 4862 West Cornelia, Chicago, Illinois. Pltf. 56.1 Ocwen ¶ 5; *see also* Ocwen's Ans. Am. Cplt. ¶¶ 2, 7. The amount of the mortgage loan from LSB was $119,700, with a final maturity date of October 1, 2012. Pltf. 56.1 Resp. Aurora ¶ 2. The interest rate was 10.65%. *Id.* Under the mortgage loan, Hukic was required to make monthly payments in the amount of $1,334.32. Pltf. 56.1 Resp. Ocwen ¶ 7. Paragraphs two and four of the Mortgage Agreement provided that the borrower, Hukic, shall pay all taxes and yearly hazard or property insurance premiums. Hukic Dep. Ex. 2 ¶¶ 2, 4; Pltf. 56.1 Resp. Aurora ¶ 12; Pltf. 56.1 Resp. Ocwen ¶ 17. The Mortgage Agreement allows the borrower to pay the taxes and insurance premiums directly to the person owed payment provided that:

> Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrow shall promptly furnish to Lender receipts evidencing the payments.

Hukic Dep. Ex. 2 ¶¶ 2, 4; Pltf. 56.1 Resp. Aurora ¶ 12; Pltf. 56.1 Resp. Ocwen ¶¶ 17, 18.

---

[3] Citations to "Plaintiff's Answer to Aurora's Statement of Material Facts" have been abbreviated to "Pltf. 56.1 Resp. Aurora," citations to Plaintiff's Answer to Ocwen's Statement of Material Facts" have been abbreviated to "Pltf. 56.1 Resp. Ocwen," citations to "Aurora Loan Service LLC's Reply to Plaintiff's Statement of Additional Material Facts" have been abbreviated to "Aurora 56.1 Rep.", and citations to "Ocwen Loan Servicing LLC's Reply to Plaintiff's Statement of Additional Material Facts" have been abbreviated to "Ocwen 56.1 Rep."

*The April 1998 Mortgage Payment to LSB*

Hukic submitted his monthly payments to LSB using money orders. Pltf. 56.1 Ocwen ¶ 8. Hukic's monthly payments were initially $1,334.32. Aurora 56.1 Rep. ¶ 6. On April 8, 1998, Hukic submitted a $1,335 money order to LSB. Pltf. 56.1 Resp. Ocwen ¶ 9. LSB made an "input error" or a "bookkeeping error" and entered the amount as $1,335. Pltf. 56.1 Resp. Aurora ¶10; Pltf. 56.1 Resp. Ocwen ¶ 9.[4]

*Aurora Begins Servicing Hukic's Mortgage*

On or about May 8, 1998, Hukic's mortgage loan was transferred from LSB to Aurora for servicing. Pltf. 56.1 Resp. Ocwen ¶ 10; Aurora 56.1 Rep. ¶ 4. LSB forwarded only $1,135 to Aurora to be applied to Hukic's loan. Pltf. 56.1 Resp. Aurora ¶ 7. Because the amount of money received by Aurora was $200 less than the mortgage payment amount, Hukic's funds were placed in a "suspense account" and were not applied to the payment due for April 1998. Pltf. 56.1 Resp. Aurora ¶ 9. Shortly after the mortgage was transferred and again on August 25, 1998, Aurora told Hukic that his April 1998 payment was deficient and that Hukic should request a refund from the issuer of the money order that he used to make his April 1998 payment. Pltf. 56.1 Resp. Ocwen ¶¶ 11, 12. Hukic did not go back to the money order issuer for a refund of the $200 nor did Hukic or his attorneys contact LSB regarding the April 1998 money order payment. Pltf. 56.1 Resp. Ocwen ¶¶ 13-15. Instead, Hukic faxed a copy of the April 1998 money order to Aurora in May, June, and July 1998. Aurora 56.1 Rep. ¶ 5. Although Hukic continued to make full and timely payments to

---

[4] This Court finds that Hukic all or part of Hukic's Responses to paragraphs 9, 14, 16-23, 26-36, 38-39, 41, and 46 of Ocwen's Statement of Facts and Hukic's Responses to paragraphs 10, 12-13, 17, and 26 of Aurora's Statement of Facts were insufficiently denied.

Aurora, Hukic's loan appeared to be one-month delinquent because each of his subsequent monthly payments was applied to the amount due for the prior month. Pltf. 56.1 Resp. Aurora ¶ 10.

When Aurora began servicing the loan, LSB advised Aurora that Hukic's hazard insurance had expired. Consequently, Aurora forced a coverage insurance binder on the account. Pltf. 56.1 Resp. Aurora ¶ 11; *see also* Hukic Dep. Ex. 8. Aurora mailed a copy of the binder to Hukic and told him that if current evidence of insurance was not received prior to the expiration of the sixty day binder period, the binder would go to the policy and an escrow account would be established to pay the $1,716 annual premium for policy year April 1998 to April 1999. *Id*. Evidence of insurance was not received, and Aurora advanced the funds for hazard insurance. *Id*. Aurora further advised Hukic's counsel that it paid Hukic's premiums for the April 1999 to April 2000 year. *Id.*

In addition to paying Hukic's property insurance, Aurora paid Hukic's property taxes in the amount of $1,297.28 for the first half of 1999. Pltf. 56.1 Resp. Ocwen ¶ 20. If Hukic paid his property taxes directly, the Mortgage Agreement obligated him to provide evidence of proof of payment. Pltf. 56.1 Resp. Ocwen ¶ 19. However, Hukic refused numerous requests to provide this information. *Id.* In July and November 1999 Hukic's insurance agent faxed Aurora insurance information, but the record is silent on what information was provided. Aurora 56.1 Rep. ¶ 7. Hukic was apprised regarding problems with the payment of property taxes and insurance, but took no actions to correct the problems because he claimed that it was not his responsibility. Pltf. 56.1 Resp. Aurora ¶ 12. Aurora established an escrow account pursuant to the terms of the mortgage agreement for the reimbursement of the money it had advanced to pay Hukic's 1999 property taxes and Hukic's monthly payment increased as a result. Pltf. 56.1 Resp. Ocwen ¶¶ 11, 21; *see also*

Aurora Ex. 8.[5]  Despite the increase, Hukic continued to make monthly payments in the amount of $1,335.  Pltf. 56.1 Resp. Ocwen ¶ 23.

Aurora has not serviced Hukic's loan since February 2000.  Pltf. 56.1 Resp. Aurora ¶ 18. Aurora continued to report the loan as delinquent through the time that the loan servicing was transferred from Aurora to Ocwen on or about March 9, 2000.  Pltf. 56.1 Resp. Aurora ¶ 17.  Hukic contacted Aurora telephonically on fifteen occasions within the first five months of Aurora's servicing of the loan and a total of thirty-six times during Aurora's tenure servicing of the loan.  Pltf. 56.1 Resp. Aurora ¶ 15.

*Ocwen Begins Servicing Hukic's Mortgage*

Hukic's mortgage was transferred from Aurora to Ocwen for servicing on March 3, 2000. Aurora 56.1 Rep. ¶ 9; Ocwen 56.1 Rep. ¶ 5.  As of March 13, 2000, Ocwen's records reflect that Hukic owed $7,261.16 in principal and interest, escrow advances and late charges.  Pltf. 56.1 Resp. Ocwen ¶ 27; Ocwen Ex. 15.  In addition to the amount owed as a result of the April 1998 mortgage payment, Ocwen asserts that Hukic's account was in default when the mortgage was transferred to it for servicing because Hukic failed to make his January 1, 2000 mortgage payment.  Pltf. 56.1 Resp. Ocwen ¶ 25; *see also* Ocwen Ex. B.  Ocwen's comment log notes three entries on March 20, 2000 associated with a January 1, 2000 payment, but there is no explanation regarding the meaning of the log's codes or entries.  *Id*.

Although Hukic was paying his property taxes directly, he failed to provide Ocwen with a copy of his tax bill and proof of payment even though his Mortgage Agreement required him to do

---

[5]  Hukic disputes that the monthly payment should have been increased and Aurora claims that the increase resulted from the deficient April 1998 payment and the fact that Aurora was forced to advance tax and insurance payments on Hukic's behalf.

so. Pltf. 56.1 Resp. Ocwen ¶ 34. On or about September 8, 2000, Ocwen advanced $1,116.38 to pay Hukic's property taxes and made adjustments to Hukic's escrow account to reflect the funds it had remitted on his behalf. Pltf. 56.1 Resp. Ocwen ¶ 35. Once Ocwen learned of his payments, Ocwen requested that Hukic obtain a refund of the property taxes he paid to Cook County and that Hukic remit the full amount of the refund to Ocwen to reimburse Ocwen for the deficiency in the escrow account. Pltf. 56.1 Resp. Ocwen ¶ 36. Hukic did not request a refund of the property taxes for himself and did not remit funds to Ocwen to cure the deficiency in his escrow account. Pltf. 56.1 Resp. Ocwen ¶ 37.

On February 7, 2001 and October 15, 2001, Ocwen advanced funds in the amount of $1,319.12 and $1,636.49, respectively, to pay Hukic's property taxes and made adjustments to Hukic's escrow account to reflect the funds it had remitted on his behalf. Pltf. 56.1 Resp. Ocwen ¶¶ 38, 39. Hukic continued to pay $1,335 for his monthly mortgage payment representing principal and interest.

<em>Ocwen's Notifies Hukic that he is in Default</em>

Ocwen mailed Hukic a notice of default on March 13, 2000, eight days after Ocwen began servicing Hukic's loan. The notice advised Hukic that he was required to remit a payment of $7,261.16 by April 12, 2000 to cure the delinquency on his account and that failure to cure the default could result in the initiation of foreclosure proceedings. Pltf. 56.1 Resp. Ocwen ¶¶ 26, 27, 28. The notice provided a method to dispute the debt. It stated:

> "Unless you dispute the validity of the debt, or any portion thereof, within thirty days after receipt of this letter, the debt will be assumed to be valid by Ocwen Federal. If you notify Ocwen Federal in writing within thirty days that the debt or a portion of the debt is disputed, Ocwen Federal will send you verification of the debt.

Verification of the debt or a portion thereof may be requested in writing from the below named Loan Resolution Consultant within thirty days."

Pltf. 56.1 Resp. Ocwen ¶ 29.

On March 21, 2000, April 7, 2000, August 30, 2000, September 11, 2000, October 11, 2000, November 9, 2000, December 12, 2000, February 13, 2000, March 14, 2001, April 13, 2001, and May 15, 2001, Ocwen mailed and Hukic received and read similar notices of default. Pltf. 56.1 Resp. Ocwen ¶¶ 30, 31. Hukic did not dispute the validity of the debt or deficiency. Pltf. 56.1 Resp. Ocwen ¶ 33. On December 6, 2000, Ocwen wrote Hukic and advised him that his mortgage had been transferred to Ocwen's Early Intervention Department for review and possible foreclosure. Pltf. 56.1 Resp. Ocwen ¶ 32. The letter stated, "We hope that you will take advantage of this invitation to settle your account and avoid further damage to your credit rating." *Id.*

On January 11, 2001, Hukic's counsel, Stephen Komie ("Komie"), sent a letter to Aurora stating that his firm had been retained to represent Hukic in connection with Aurora's "libelous and slanderous behavior" toward Hukic. Pltf. 56.1 Resp. Aurora ¶ 19; Komie letter. The letter advised that Hukic made timely payments to Aurora and was paying his property taxes directly. Komie stated that Hukic had been unable to refinance his home due to Aurora's negative reports. *Id.* Komie sent another letter on July 18, 2001 and on October 12, 2001, Aurora's counsel responded. Pltf. 56.1 Resp. Ocwen ¶ 45; Pltf. 56.1 Aurora ¶ 11 *see also* Hukic Dep. Ex. Aurora wrote that on August 25, 1998, Aurora telephoned Hukic and discussed LSB's "bookkeeping error." *Id.*; *see also* Pltf. 56.1 Resp. Aurora ¶ 20; Exhibit E. The letter explained:

"Although the money order was in the amount of $1335, it appears that the amount was input as $1135 and the money order was cashed in that amount. These funds were forwarded to and received by [Aurora] on June 26, 1998. Because the funds were not sufficient to apply the monthly payment, the funds were deposited to the

suspense account. The suspense account is a holding account for unapplied funds. Mr. Huckic (sic) must contact the issuer of the money order to request a refund of the $200.00 difference between the amount purchased and the amount paid by the money order issuer. This information was relayed to Mr. Hukic during an August 25, 1998 telephone conversation."

Aurora's letter explained why the April 1998 payment caused the remainder of Hukic's monthly payments to be deposited into a suspense account and discussed Aurora's advances from 1998 to 2000 associated with Hukic's property tax and insurance premiums. *Id.* Hukic's attorney sent similar letters Ocwen in 2001 disputing the accuracy of information appearing on his credit report. Pltf. 56.1 Resp. Ocwen ¶ 45. Hukic does not believe that Aurora and Ocwen intentionally reported his credit incorrectly, but rather, he believes that they made a mistake. Pltf. 56.1 Resp. Aurora ¶ 25.

*Foreclosure in Illinois State Court*

On November 7, 2001, First Union National Bank filed a foreclosure action against Hukic. Pltf. 56.1 Resp. Ocwen ¶ 42; Aurora 56.1 Rep. ¶ 10.[6] On June 16, 2003, the foreclosure proceedings were dismissed without prejudice pursuant to 735 ILCS 5/2-619 and Hukic's mortgage was reinstated. Pltf. 56.1 Resp. Ocwen ¶ 43. The order reflects that Hukic tendered proof of payment of Cook County Real Estate taxes for 2002 and the first installment of 2003. Aurora 56.1 Rep. ¶ 14; Hukic Ex. D, Order dated June 16, 2003. The judgment was recorded with the Cook County Recorder of Deeds. Aurora 56.1 Rep. ¶ 15. After 90 days, the dismissal was with prejudice. *Id.*

In July and August 2003, Hukic prepared an Application for Property Tax Refund. Pltf. 56.1 Resp. Ocwen ¶¶ 37*,* 44. In that document, an Ocwen representative certified that Ocwen paid the

---

[6] On December 6, 2002, Pacific Premier Bank, F.S.B., f/k/a Life Savings Bank F.S.B., assigned Hukic's mortgage and note to First Union National Bank, as trustee. Aurora 56.1 Rep. ¶ 11.

property taxes in error. *Id.* At no point prior to foreclosure did Hukic remit funds to cure the $200 shortfall in the April 1998 payment. Pltf. 56.1 Resp. Ocwen ¶ 16.

*Hukic Notifies Trans Union that he disputed the status of his account*

On April 1, 2004, nearly one year after foreclosure proceedings concluded, Hukic notified Trans Union, a credit reporting agency, that he disputed the status of his Ocwen account and asked Trans Union to investigate. Pltf. 56.1 Resp. Ocwen ¶ 46; Hukic Dep. Ex. 10. On or before April 1, 2004, Hukic's employer, Stephen Glarner, also drafted a letter to Trans Union on Hukic's behalf asking Trans Union to investigate the accuracy of the information relating to Hukic's Ocwen account. Pltf. 56.1 Resp. Ocwen ¶ 47. Glarner's letter is not a part of the record. According to Hukic, Glarner's letter was Hukic's first request for investigation that Hukic made to any credit reporting agency. Pltf. 56.1 Resp. Ocwen ¶ 48.

On May 1, 2004, Trans Union informed Hukic that the negative credit information reported by Ocwen had been deleted from his credit report. Pltf. 56.1 Resp. Ocwen ¶ 51; Hukic Dep. Ex. 33. According to the report, Trans Union file number 1263187812, the only "adverse account" was associated with an Aurora Loan. The maximum delinquency on the Aurora account was "60 days past due" in April 2000 and Hukic paid 30 days late sometime in the 17 months prior to the last update on the account. *Id.*

On May 14, 2004, Trans Union sent a letter to Hukic stating that Trans Union had "recently" received Hukic's dispute, Trans Union file number 127127008953. Aurora 56.1 Rep. ¶ 16; Hukic Dep. Ex. 11. However, Trans Union refused to accept the dispute because it was sent by a third party. Hukic Dep. Ex. 11. Trans Union gave Hukic a form to fill out and return in the event that he wished to dispute the matter directly. Pltf. 56.1 Resp. Ocwen ¶ 49. Hukic, with Glarner's assistance,

filled out the form and returned it to Trans Union within a few days. Pltf. 56.1 Resp. Ocwen ¶ 50; Hukic Dep. Ex. 11; Hukic Dep., pp. 110-111. In the form, Hukic disputed both Ocwen's and Aurora's credit reports. Hukic Dep. Ex. 11. The typed portion of the form stated that "Upon receipt of your request, an investigation will be initiated and completed within 30 days. Upon completion, you will receive written notice of the results of the investigation." *Id*. If Trans Union responded to this request, it was not included in the record.

Hukic produced an August 8, 2006 Equifax Credit Report and under Aurora's Account History section, there is an entry indicating that in December 1999 Hukic's account was "30-59 days past due." Hukic Ex. M. Additionally, there are two entries indicating that Hukic's account was "60-89 days past due" in January and February of 2000. *Id*. Hukic claims that the report demonstrates that Aurora continued to report Hukic as "paying late" up to and including August, 2006. Ocwen 56.1 Rep. ¶ 13. Aurora denies that the report is adverse because the report states that the Aurora loan has been "paid," that its current status is "pays as agreed," and that there is no past due amount . *Id*.; *see also* Hukic Ex. M. Ocwen's negative reports were deleted from Hukic's credit report on or before May 1, 2004. Pltf. 56.1 Resp. Ocwen ¶ 51.

Hukic's annual income in 2000 was $24,000 and Hukic's employer, friends, and family contributed toward his monthly expenses. Pltf. 56.1 Resp. Aurora ¶ 26. From 2000 to 2004, Hukic's monthly financial obligations included his monthly mortgage payment of $1,335, a $500 car loan payment, monthly bills for his home telephone, property taxes, electricity, groceries, car insurance, medicine, and clothes, and payments to several credit cards from agencies such as Visa, Banco Popular, American Express, LaSalle Bank, Home Depot, Sam's Club, and Menards. *Id*. He never paid his credit card balances in full, but made minimum payments. *Id*. Although Hukic had a Sallie

Mae loan for his son, he does not remember his monthly payment. *Id*. Hukic was a co-signor for several other loans for his friends that came to the country without a credit history. *Id*. Hukic's monthly expenses were approximately $2,384.00. *Id*. Hukic's income did not cover his monthly expenses in 2000, but he was able to make up for the difference because his boss paid some of his expenses and his family contributed to his monthly bills in lieu of paying rent.[7] Without receiving contributions from friends, family, and Hukic's employer, Hukic would not have been able to pay all of his bills. *Id*. Hukic's family continued to contribute to his monthly bills through 2005. *Id*.

*Hukic's applications for loans and credit*

On September 4, 2001 and October 18, 2001, Hukic applied for a loan from State Farm Bank and his application was denied. Pl. Am. Cplt. Ex. O. State Farm based its decision to deny Hukic's loan application "in whole or in part" upon information contained within a Trans Union report. *Id*. On September 7, 2001, Wells Fargo denied Hukic's application for a credit application on the basis of information it received from Trans Union. *Id*. On the same day, Hukic's credit application to purchase an ABT Television was denied based upon information it received in an Equifax credit report. *Id*. Specifically, ABT denied the application due to "serious delinquency," the amount Hukic owed on delinquent accounts, ABT's opinion that Hukic's balances were too high on revolving accounts, and because Hukic's last delinquent report was too recent or was unknown. *Id*. On June 24, 2002, Monogram Credit Card Bank of Georgia denied Hukic's application for a credit line increase on his Home Depot credit card and its decision was based in whole or in part upon a report from Equifax Inc. *Id*. On July 16, 2003, Hukic's application for a Discover Credit card and

---

[7] During Hukic's deposition, Ocwen's counsel totaled Hukic's monthly expenses to be $2,384.00, but Hukic disputes that figure, without support, in his answers to Aurora's Statement of Facts.

eight days later Banco Popular denied Hukic's credit application to Northwest Auto Sales. Both agencies based their denials upon information contained in a Trans Union report. *Id.* Finally, on December 3, 2003 First Financial Mortgage Consultants, Inc. denied Hukic's application for an extension or renewal of credit based upon a Trans Union credit report that disclosed "delinquent credit obligations." *Id.*

## DISCUSSION

I.  Hukic's FCRA claims against Aurora and Ocwen

Hukic alleges that Aurora and Ocwen violated § 1681s-2(b) of the FCRA.[8]  The FCRA places various requirements on consumer credit reporting agencies, furnishers of credit information to consumer credit reporting agencies, and users of consumer credit reports. Aurora and Ocwen are furnishers of credit information. 15 U.S.C. § 1681a(f). The duties created by §1681s-2(b) arise only after the furnisher receives notice from a consumer reporting agency that a consumer is disputing credit information. *Dornhecker v. Ameritech Corp.*, 99 F. Supp. 2d 918, 925 (N.D. Ill. 2000). Once a furnisher has received notice, it must:

> (A) conduct an investigation with respect to the disputed information;
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
> (C) report the results of the investigation to the consumer reporting agency; and
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

15 U.S.C. § 1681s-2(b)(1)(A-D).

---

[8] This Court previously ruled that there is no private right of action under 15 U.S.C. §1681s-2(a).

A.     <u>Aurora's and Ocwen's Statute of Limitations Defenses</u>

Defendants contend that Hukic's FCRA claims are time barred. Hukic's § 1681s-2(b) claim was filed on July 1, 2005. The FCRA includes a limitation on private actions brought to enforce its provisions. The statute provides:

> An action to enforce any liability created under this subchapter may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction, not later than the earlier of–
>
> (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or
>
> (2) 5 years after the date on which the violation that is the basis for such liability occurs.

15 U.S.C. § 1681p.

Hukic disputed the status of his Ocwen account to Trans Union on April 1, 2004 and disputed his Aurora account shortly after May 14, 2004. Pltf. 56.1 Resp. Ocwen ¶¶ 46, 50; Hukic Dep. Ex. 10, 11; Hukic Dep. pp. 110-111. Defendants' obligations under §1681s-2(b) were triggered only after Trans Union gave notice to Defendants that Hukic disputed the accounts on his credit report.

Defendants could not have violated the provisions of subsection (b) until the 30-day time-period under § 1681i(a) expired. Assuming Trans Union notified Ocwen and Aurora regarding Hukic's disputes on the same day they were received, Ocwen and Aurora had until May 1, 2004 and June 14, 2004, respectively, to comply with the provision of §1681s-2(b). Therefore, Hukic's claims were timely filed on July 1, 2005.

B.     Ocwen's Liability under §1681s-2(b)

On April 1, 2004, Hukic sent a letter to Trans Union disputing the status of his Ocwen account and asked Trans Union to investigate Ocwen's report. Pltf. 56.1 Resp. Ocwen ¶ 46; Hukic Dep. Ex. 10. Following Hukic's dispute, Trans Union had a duty under § 1681i(a) to convey information to Ocwen regarding Hukic's dispute. 15 U.S.C. § 1681s-2(b); 15 U.S.C. §1681i(a)(1); *see also Nelson v. Chase Manhattan Mortgage Co.*, 282 F.3d 1057, 1060 (9th Cir. 2002). Once Trans Union conveyed Hukic's dispute to Ocwen, Ocwen had a duty to conduct an investigation regarding the disputed information, review all relevant information by Trans Union, and report the result of the investigation to Trans Union within the time period allotted under the statute. 15 U.S.C. § 1681s-2(b); 15 U.S.C. § 1681i(a)(2). Ocwen complied with the provisions of subsection (b) because it removed the negative information it reported on or before May 1, 2004. Pltf. 56.1 Resp. Ocwen ¶ 51. Hukic's August 8, 2006 Equifax report is further evidence that Ocwen complied with §1681s-2(b)(D) because the report contained no adverse findings associated with Ocwen's account.

Although Hukic argues that Ocwen had a duty to inform Aurora that Hukic's credit report was disputed, his argument is premised upon the fact that servicing of the loan was transferred from LSB to Aurora to Ocwen and that Ocwen became Aurora's "sub-agent" and Aurora was LSB's agent. In order to prevail under this "sub-agent" theory, the record would need to reflect that Aurora employed Ocwen to assist Aurora in transacting the affairs of Aurora's principal, LSB. *See Ayh Holdings, Inc. v. Avreco, Inc.*, 826 N.E.2d 1111, 1125-26 (Ill. App. Ct. 2005) (*see also* Black's Law Dictionary 1277 (5th ed. 1979)(A sub-agent is a person employed by an agent to assist him in transacting the affairs of his principal). In fact, Aurora has not serviced the loan since February 2000. Pltf. 56.1 Resp. Aurora ¶ 18. It follows that Aurora did not employ Ocwen to assist it in

"transacting the affairs of its principal." Although Hukic argues that it was "highly likely" that Aurora reported Hukic late and that because Ocwen had the authority to access Hukic's credit report, Ocwen had constructive knowledge that Aurora reported Hukic late, his argument is factually unsupported in the record. More important, a furnisher of information has no duty under the statute to report to other furnishers of information; nor is there a statutory duty to investigate another furnisher's reporting information. *See* 15 U.S.C. § 1681s-2. Accordingly, Hukic advances no persuasive authority to support the imposition of a duty upon Ocwen as a furnisher of information to pass information from Trans Union to Aurora and be held liable for Aurora's failure to correct the inaccurate information. Accordingly, there is no genuine issues of material fact associated with Hukic's claims under §1681s-2(b) against Ocwen. Ocwen is entitled to summary judgment and Count XIV is dismissed with prejudice.

C.      Aurora's liability under 15 U.S.C. §1681s-2(b)

Hukic's April 1, 2004 letter disputed the accuracy of Ocwen's account and not Aurora's. Pltf. 56.1 Resp. Ocwen ¶ 46; Hukic Dep. Ex. 10. Hukic disputed the status of Aurora's account a few days after May 14, 2004. Hukic Dep. Ex. 11. The typed portion of the Trans Union form stated that "Upon receipt of your request, an investigation will be initiated and completed within 30 days. Upon completion, you will receive written notice of the results of the investigation." Hukic Dep. Ex. 11. However, if Trans Union's responded, its response was not included in the record. Further, there is no evidence that Trans Union notified Aurora. Hukic produced an August 8, 2006 Equifax credit report as evidence that Aurora continued to furnish negative reports to credit agencies. Under Aurora's Account History, the report shows two entries of "60-89 days past due" in January and February of 2000 and "30-59 days past due" in December 1999, but the report concludes that the

current status of the loan is "pays as agreed" and that there is no amount past due. Hukic Ex. M.

Even if this Court were to assume that the Equifax Report was adverse to Hukic, there is nothing to

indicate that Aurora continued to furnish this report after Trans Union provided proper notice to

Aurora under the statute.[9]  Aurora 56.1 Rep. ¶ 17; *see also* Hukic Ex. M.  Aurora's duty under

§1681s-2(b) was not triggered until sometime after May 14, 2004 and without some evidence that

Trans Union notified Aurora of Hukic's dispute, Hukic's § 1681s-2(b) claim against Aurora is

factually insufficient and summary judgment is appropriate.

Hukic argues that Aurora and Ocwen failed to correct LSB's "bookkeeping" error which

input Hukic's April 1998 payment as $1,135 instead of $1,335 and that Defendants' subsequent

reports to credit agencies regarding Hukic's April 1998 payment were inaccurate.  Whether Aurora

or Ocwen should have provided negative information in the first instance to credit reporting agencies

associated with Hukic's April 1998 payment or deficiencies associated with the escrow account is

---

[9]  Trans Union's duties fall under 15 U.S.C. § 1681i(a)(2) which provides:

Prompt notice of dispute to furnisher of information.

> (A) In general. Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer.

> (B) Provision of other information from consumer. The consumer reporting agency shall promptly provide to the person who provided the information in dispute all relevant information regarding the dispute that is received by the agency from the consumer after the period referred to in subparagraph (A) and before the end of the period referred to in paragraph (1)(A).

immaterial to Defendants' liability under §1681s-2(b).[10]   Similarly, even though Hukic repeatedly

advised Aurora and Ocwen of the bookkeeping error and Defendants concede that the error was

LSB's, Hukic's complaints directly to his creditors do not trigger liability under §1681s-2(b).  *See*

*Dumas v. Dovenmuehle Mortgage, Inc.*, 2005 U.S. Dist. LEXIS 13369, *17 (N.D. Ill. 2005) (plaintiff

must show that the furnisher received notice from a credit reporting agency, not the consumer, that

the credit information is disputed); *See also Nelson*, 282 F.3d at 1060 (describing the filter set up by

Congress to prevent furnishers of information from being sued by every dissatisfied consumer).

Accordingly, Hukic's claims against Aurora under the FCRA do not withstand summary judgment

and Count XIII is dismissed with prejudice.

Because Hukic has not proffered evidence supportive of his claim under FCRA §1681s-2(b),

there is no occasion to consider damages.  *See also Ruffin-Thompkins v. Experian Info. Solutions*,

422 F.3d 603, 610 (7th Cir. 2005) ("because [plaintiff's] claim under the FCRA cannot survive, it

follows, *a fortiori*, that the court must deny her claim for punitive or statutory damages.").  Hukic

is only entitled to punitive damages if Aurora and Ocwen "willfully" failed to comply with "any

requirements of this subchapter."  15 U.S.C. § 1681n(a).  Any negative information associated with

Ocwen was removed within 30 days of Hukic's request and there is no evidence that Ocwen willfully

failed to comply with §1681s-2(b) after Hukic notified Trans Union.  Similarly, the record is silent

on Trans Union and Aurora's response to Hukic's request made on or after May 14, 2004.

---

[10]  Hukic initially brought suit under 1681s-2(a) which concerns Aurora and Ocwen's duties as furnishers of information to provide accurate information to consumer reporting agencies.  This Court struck Hukic's claims brought under FCRA 1681s-2(a) because there is no private right of action under that section.  *See* 15 U.S.C. §1681s-2(c)(specifically prohibiting the use of the statutes permitting private rights of action in the FCRA, §1681n and §1681o, for enforcement of subsection (a)); *Rollins v. People's Gas Light and Coke Co.*, 379 F. Supp. 2d 964, 966-67 (N.D. Ill. 2005) (distinguishing claims under subsection (a) from those under subsection (b)).

Therefore, there is no evidence supportive of "willful" conduct on Aurora's behalf. Accordingly, Count XV seeking punitive damages under the FCRA is dismissed with prejudice.

II.  <u>Hukic's state law claims against Aurora and Ocwen for Tortious Interference with Prospective Economic Advantage and Breach of Contract</u>

    A.  <u>The dismissal of the State Court foreclosure action</u>

Hukic contends that Defendants are collaterally estopped from arguing that he failed to comply with the terms of the mortgage agreement because those issues were litigated in the June 2003 foreclosure proceeding in Illinois State Court. (Hukic's Resp. Ocwen, p. 6; Hukic Resp. Aurora, p. 15). Illinois applies the doctrines of collateral estoppel to preclude individuals from re-litigating claims and issues that have been "finally determined between the parties on the merits, by a court of competent jurisdiction[.]" *Feltman v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 2006 U.S. Dist. LEXIS 57579, *7-8 (N.D. Ill. 2006) (citing *Charles E. Harding Co. v. Harding*, 186 N.E. 152, 155 (Ill. 1933). Collateral estoppel applies where (1) the issue previously decided is identical to the issue in the current suit; (2) there was a final judgment on the merits; (3) the party against whom estoppel is asserted was a party to the prior action . . .; and (4) the factual issue . . . has actually and necessarily been litigated and determined in the prior action. *Id*; *citing Boelkes v. Harlem Consolidated Sch. Dist. No. 122*, 842 N.E.2d 790, 795 (Ill. App.Ct.. 2006). Whether the doctrine of collateral estoppel should bar Defendants from litigating their defense to Hukic's breach of contract claim in federal court involves analysis of the nature of and ruling on the motion to dismiss the state court action.

On May 16, 2003, the Circuit Court Order reflected that "Ocwen F.S.B. as servicer for First Union will accept reinstatement of monthly payments only" and the parties to continue to negotiate

as to the tax escrow issue.  (Exhibit B, Ocwen's Reply).   The order stated that the hearing on

Defendant's 2-619 Motion to Dismiss was stricken, and the matter was continued for status on June

16, 2003.  *Id.*   On June 16, 2003, the foreclosure proceedings were dismissed without prejudice

pursuant to 735 ILCS 5/2-619 and Hukic's mortgage was reinstated.  Pltf. 56.1 Resp. Ocwen ¶ 43.

The order reads:

> "This matter coming to be heard upon the Defendants Avdo Hukic's Motion for
> Involuntary Dismissal: due notice being given; the Court being fully advised in
> the premises; doth find: A) That the Court has jurisdiction over the parties and the
> subject matter: B) That the Defendant has tender(sic) proof of payment of Cook
> Co. Real Estate Taxes for Tax year 2002 and first installment of 2003.  IT IS
> ORDERED: A) That the Defendant' motion to dismiss pursuant to 735 ILCS
> 5/619 (sic) is granted without prejudice to Reinstate within 90 days.  Further, after
> 90 days, this dismissal is with prejudice."

(Exhibit A, Ocwen Reply).

Hukic's Motion in the foreclosure proceeding was brought pursuant to 735 ILCS 5/2-619.

Hukic's argued that First Union National Bank's claim was barred because Aurora acknowledged

that LSB made an input error related to the April 1998 mortgage payment.  Hukic Ex. E.  First Union

National Bank ("First Union") filed a foreclosure action against Hukic.  Pltf. 56.1 Resp. Ocwen ¶

42; Aurora 56.1 Rep. ¶ 10.  Hukic's mortgage and note were assigned to First Union by LSB.

Aurora 56.1 Rep. ¶ 11.  Aurora and Ocwen were not parties to the foreclosure proceeding, but Hukic

argues that Aurora and Ocwen are First Union's agents.  As stated above, Hukic failed to established

a "sub-agent" relationship between Aurora and Ocwen and Aurora's "principal," LSB and Hukic's

assertion that First Union contracted with Ocwen, its agent, to continue to service the loan, is

similarly unsupported in the record.  (Hukic Response Ocwen, p. 7; see also Ocwen 56.1 Rep. ¶¶ 7-

9).  However, Aurora and Ocwen serviced Hukic's loan and Ocwen was referenced in the May 16, 2003 order as agreeing to reinstate the mortgage.

Even if this Court were to assume that Aurora and Ocwen, as servicers of Hukic's mortgage, became First Union's agents when LSB assigned the mortgage, Hukic cannot meet the first, and fourth prongs of the elements of collateral estoppel.  Namely, Hukic has not proffered evidence that the issues previously decided in the foreclosure action are identical to the issues in the current suit and that the factual issues have actually and necessarily been litigated and determined in the prior action.  For example, the June 16, 2004 Court Order states that Hukic tendered proof of payment of Cook County real estate taxes for the Tax year 2002 and first installment of 2003.  However, there is nothing in the record to indicate that Hukic tendered proof of those payments to his lenders prior to the foreclosure action, and in fact, Hukic concedes in this litigation that he failed to tender proof of payment to his lenders.  Pltf. 56.1 Resp. Ocwen ¶¶ 19, 34, 41.  Morever, the May 16, 2003 order states that the parties agreed to reinstate the mortgage, but the order does not state whether the Court found as a matter of law whether Hukic was in default.  The Order suggests that Hukic was in default because it states that the mortgage was "reinstated."  *See* 735 ILCS 5/15-1602 (Reinstatement is effected by curing all defaults then existing, other than payment of such portion of the principal which would not have been due had no acceleration occurred, and by paying all costs and expenses required by the mortgage to be paid in the event of such defaults...").  Finally, there is nothing in the record that explains the basis of the Court's ruling or that it found plaintiff's factual assertions in its motion to be true after an evidentiary hearing.  In summary, there is nothing in the record to supoprt the application of the doctrine of collateral estoppel to Hukic's breach of contract claims  against Defendants.

Aurora argues that § 1681(h)(e) of the FCRA preempts Hukic's state law claims for tortious interference with prospective economic advantage and breach of contract. Although not addressed by the parties, the more specific preemption clause in § 1681t(b)(1)(F), which provides in pertinent part, "[n]o requirement or prohibition may be imposed under the laws of any State (1) with respect to a subject matter regulated under... section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies..." 15 U.S.C. § 1681t(b)(1)(F). Congress added the more sweeping §1681(b)(1)(F) language in a series of 1996 amendments. Those amendments made no mention of the earlier §1681(h)(e) language.

Section 1681t(b)(1)(F) preempts any subject matter regulated under section 1681s-2. 15 U.S.C. § 1681t(b)(1)(F). Although some courts have held that § 16812t(b)(1)(F) completely preempts all state law causes of action, and thus eliminates the possibility of any supplemental state claims against furnishers of information, (*See Hasvold v. First USA Bank*, 194 F. Supp. 2d 1228 (D. Wyo. 2002); *see also Jaramillo v. Experian Info Solutions, Inc.*, 155 F. Supp. 2d 356, 363 (E.D. Pa. 2001)), other courts have held that the provision has a more limited scope. *See Stafford v. Cross Country Bank*, 262 F. Supp. 2d 776, 785-787 (W.D. Ky. 2003); *see also Vazquez-Garcia v. Trans Union de Puerto Rico*, 222 F. Supp. 2d 150, 161 (D. P.R. 2002); *Aklagi v. Nationscredit Financial Services, Corp.*, 196 F. Supp. 2d 1186, 1194 (D. Kan. 2002). Under the latter approach, the only state law claims preempted are those relating to the obligations of furnishers of information once they know, or have reason to know, about possible inaccuracies. *Id.* That is, these courts interpret § 1681t(b)(1)(F) as preempting only those claims that relate to the actual language of § 1681s-2. *Id*

If the allegations against defendants are not regulated by § 1681s-2, then they are not preempted by § 1681t(b)(1)(F). *See Brown v. Bank One Corp*., 2002 U.S. Dist. LEXIS 22692, *4 (N.D. Ill. 2002) (Defendants alleged misconduct in issuing false loans in plaintiffs' names does not raise a challenge to the information supplied to consumer reporting agencies, and thus, is not regulated by the FCRA); *see also Dornhecker*, 99 F. Supp. 2d at 931 (plaintiffs' claim for breach of duty arising from defendant's opening of accounts based on stolen information was not regulated by the FCRA). Accordingly, whether Hukic's state law claims against Defendants for tortious interference and breach of contract are preempted by § 1681t(b)(1)(F) depends upon whether the Defendants' alleged misconduct is regulated by § 1681s-2.

Section 1681s-2(a) sets forth the duties of furnisher of information to provide accurate information when they know or have reasonable cause to believe that the information is inaccurate and correct information that they know is inaccurate. 15 U.S.C. § 1681s-2(a). Section 1681s-2(a) also regulates a furnisher's duty to provide notice of delinquency of accounts to credit reporting agencies. *Id.* Section 1681s-2(b) concerns the duties of furnishers of information once a consumer notifies a credit reporting agency that he is disputing information on his credit report. 15 U.S.C. § 1681s-2(b). Hukic's alleges that Defendants knowingly reported false information regarding the status of Hukic's account to credit reporting agencies– conduct regulated by § 1681s-2(a). *See* Pl. Am. Cplt. Counts VI and VI. Similarly, Defendants' conduct following Hukic's notice to Trans Union that he disputed the accuracy of the status of his account is regulated by §1681s-2(B). *See id.* Hukic's Amended Complaint does not allege conduct on behalf of Defendants unrelated to their duties as furnishers of information such as issuing loans or opening accounts. Pl. Am. Cplt. Counts VI and VI; *See Brown*, 2002 U.S. Dist. LEXIS 22692 at *4; *see also Dornhecker*, 99 F. Supp. 2d at

931.  Accordingly, Hukic's allegations associated with his tortious interference claims and the evidence Hukic proffered in support of those claims relate to Defendants' intentional and unjustified reports to credit agencies that interfered with Hukic's prospective third-party relationships with prospective lenders.  Defendants' conduct falls under the scope of Sections 1681s-2(a) and (b), and therefore, Hukic's claims against Defendants for tortious interference of prospective economic advantage are preempted by § 1681t(b)(1)(F).  As a result, Counts V and VI are dismissed with prejudice.

Unlike Hukic's tortious interference claims, not all of the allegations related to Hukic's breach of contract claims concern Defendants' conduct as furnishers of information.  Namely, Hukic's allegations that relate to their purported duties to timely negotiate all payments tendered by the borrower and to credit the note and mortgage for the full amount of the tendered payments have nothing to do with their duties as furnishers of information to credit agencies.  *See* Pl. Am. Cplt, Count II, ¶ 166.  On the contrary, Hukic's allegations concerning Defendants' duties to "investigate the inaccurate records and reports," and Defendants' conduct that relates to the reports they furnished to credit agencies are preempted by § 1681t(b)(1)(F).

C.    Hukic's Breach of Contract Claims against Defendants

While some of Defendants' conduct under the breach of contract action is not preempted by § 1681t(b)(1)(F), the surviving allegations do not withstand summary judgment because Hukic has failed to put forth evidence that he performed his obligations under the contract.  In order to state an Illinois common law claim for breach of contract, a plaintiff must state: (i) the existence of a valid contract; (ii) plaintiff's performance; (iii) defendant's breach; and (iv) damages to the plaintiff as a result of the breach.  *Catania v. Local 4250/5050 of Communications Workers of America*, 834

N.E.2d 966, 971 (Ill. App. Ct. 2005). Defendants argue that Plaintiff cannot state a claim for breach because Plaintiff failed to perform his duties under the contract when he failed to maintain required insurance on his home and failed to make adequate monthly payments. Hukic's breach of contract claim stems in part from Defendants' failure to timely apply, record, and credit his mortgage and note when it received his monthly payments. Even if this Court were to assume that LSB breached a contractual duty to input his April 1998 payment as $1,335 and that it was the lender's responsibility to cure the $200 shortfall, Hukic concedes that he failed to provide proof to LSB, Aurora, and Ocwen that he was paying his property insurance and taxes directly. As a result, Aurora and LSB advanced thousands of dollars in funds on Hukic's behalf and increased his monthly payments to remit to the escrow account. Even though Hukic was told about the problems with the insurance and taxes, he refused to tender proof of payment and continued to pay only $1,335. Hukic's Mortgage Agreement required Hukic as the borrower to notify his Lender should he pay his property taxes directly and Hukic conceded that he failed to provide such proof to LSB, Aurora, and Ocwen prior to foreclosure. Based upon Hukic's failure to comply with the provisions of the Mortgage Agreement, Hukic has failed to put forth evidence that he performed all of his obligations under the contract at issue and Hukic is barred from bringing claims against Aurora and Ocwen for breach of contract. Counts I and II are dismissed with prejudice.

Additionally, Hukic had many opportunities to correct purported deficiencies in his account, but failed to do so. Hukic could have contacted his money lender or LSB to dispute the April 1998 late payment. Hukic could have complied with the Mortgage Agreement and supplied his lenders with proof that property was insured and the taxes paid. Hukic could have also responded to any one of the eleven notices of default from Ocwen and could have disputed Aurora and Ocwen's reports

to credit reporting agencies years before his first letter of April 2004. Instead, Hukic waited until after foreclosure proceedings to tender proof of his Cook County tax payments and one year after foreclosure proceedings to dispute adverse reports with Trans Union. In short, Hukic had a duty to make a reasonable effort to avoid damages, and many if not all of his damages would have been avoided by reasonable diligence. *Maere v. Churchill*, 452 N.E.2d 694, 699-700 (Ill. App. Ct. 1983) (*quoting  Nelson v. Buick Motor Co.*, 183 Ill. App. 323, 325 (Ill. 1913) ("There can be no recovery for damages which might have been avoided by reasonable effort on the part of the person injured.") Therefore, Hukic's claims against Defendants for breach of contract do not withstand summary judgment and Counts I and II are dismissed with prejudice.

Because Hukic's state law claims are dismissed in their entirety, this Court has no occasion to consider damages and Count XII seeking punitive damages for Hukic's common law claims is dismissed with prejudice.

III.    Conclusion and Order

For the foregoing reasons, Aurora and Ocwen's Motions for Summary Judgment are granted and Hukic's claims against Aurora and Ocwen are dismissed as a matter of law with prejudice. So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:  August 31, 2007